# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| KATHERINE VAN CLEAVE | ) |
| | ) |
|     PLAINTIFF, | ) |
| | )   **CIVIL ACTION NO.:** |
| V. | ) |
| | ) |
| THE UNIVERSITY OF THE SOUTH, | ) |
| | ) |
|     DEFENDANT. | ) |

## COMPLAINT AND JURY DEMAND

### I. Introduction

1. The plaintiff, Katherine Van Cleave, brings this action for retaliation under Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e et seq., as Amended by the Civil Rights Act of 1991, 42 USC § 1981, 42 USC § 1981a, and 42 USC § 1988.

### II. Jurisdiction and Venue

2. This Court has jurisdiction in accordance with 28 U.S.C. 1331, 1343, 2201, 2202, and 29 U.S.C. 2617(a). Venue is proper pursuant to 28 U.S.C. 1391 and Title VII's Choice of Venue provision, 42 U.S.C. § 2000e-5(f)(3), which provides that "Title VII actions may be brought (1) in any judicial district in the State in which the unlawful employment practice is alleged to have been committed."

3. Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII. Plaintiff timely filed her charge of discrimination within 180 days of the occurrence of the last discriminatory act. Plaintiff also timely filed her Complaint within ninety (90) days of the receipt of a Notice of Right to Sue issued by the EEOC.

### III. Parties

4. The plaintiff, Katherine Van Cleave ("Plaintiff") is a citizen of the state of Tennessee and above the age of majority.

5. The defendant, The University of the South, is an "employer" under Title VII, 42 USC §2000e(b), and 42 USC §1981.

## IV. Statement of Facts

### A. Background and Plaintiff's History of Excellent Work Performance.

6. Plaintiff was hired by Defendant as a mental health counselor in August 2016. She remained in that position until Defendant terminated her employment on or around February 25, 2021.

7. Plaintiff graduated from The University of the South in 2007. She has an MA in Marriage and Family Therapy and is a Tennessee Licensed Professional Counselor – Mental Health Services Provider.

8. Plaintiff's job duties during her employment with Defendant involved working in Defendant's University Wellness Center providing counseling and psychological services to students. As a mental health counselor for Defendant, Plaintiff took great pride in her role as a provider of mental health and wellness services to students at her alma mater.

9. During the time relevant to this action, Plaintiff reported to Ashley Liston-Avnaim, Director of Counseling and Psychological Services at the University Wellness Center. Liston-Avnaim reported to Wellness Center Director Nicole Noffsinger-Frazier.

10. Plaintiff's performance throughout her employment was excellent, and she received consistently good performance reviews.

11. In July 2019, Plaintiff's then supervisor, John Jackson, wrote that he had "no concerns" about Plaintiff's performance.

12. In May 2018, Nicole Noffsinger-Frazier, Plaintiff's supervisor at the time who was the Director of the Wellness Center during the events at issue in this case, wrote that "Katie is an extremely valuable member of our team. She embodies the collaborative nature of our work together … She is a dedicated team player. Katie is also a talented therapist and our students are fortunate beneficiaries of her expertise." Noffsinger-Frazier wrote, "I do not have any concerns about Katie's performance."

13. In 2017, likewise, Noffsinger-Frazier wrote, "Katie continues to meet, and exceed, all expectations for her role … Never one to decline a referral, Katie is always willing to take on challenging cases and does so not only with willingness but with curiosity and interest."

### B. **Plaintiff Develops Concerns about Race Discrimination in Hiring and Engages in Protected Activity.**

14. As part of her job, Plaintiff participated on search committees to hire new counselors in December 2019 and June 2020. During these processes, she developed well-founded concerns that Defendant was discriminating against well-qualified African-American candidates in its hiring processes.

15. Plaintiff's concerns were based in part on the attitude of her supervisor, who attempted to justify her prejudice against hiring well-qualified African-American candidates by blaming the institution, writing in a June 15, 2020 email that "[m]y larger concerns are the ability to retain clinicians of color without larger institutional supports for doing so."

16. Liston-Avnaim also made a comment to the effect that "[a]ffirmative action is just supposed to get people in the door, it doesn't mean we have to hire them."

17. Plaintiff communicated her concerns regarding race discrimination via email to Dean of Students Marichal Gentry on June 16, 2020, telling him "I am concerned about current

3

and past hiring practices in regards to the staff clinician position at CAPS as it relates to our strong need to hire a person of color."

18. Plaintiff's engagement in protected activity took place against a backdrop of historically significant events that summer, including the "Black Lives Matter" movement and the national, still ongoing reckoning with issues of race discrimination in public and private life, along with her own awareness of past practices of discrimination at the university.

19. Although Ms. Liston-Avnaim placed blame on the institution for the racial biases she expressed, the University's administration at this time was both encouraging and also participating in a far-reaching reckoning along the lines of the larger national reckoning taking place during the summer of 2020.

20. On September 8, 2020, during the events at issue in this case, the University's Board of Regents issued a statement acknowledging for the first time that the University "was long entangled with, and played a role in, slavery, racial segregation, and white supremacy."

21. The Board's September 8, 2020 statement included a link to the findings of the Roberson Project, a six year initiative begun by the university in 2017 "to investigate the University's historical entanglements with slavery, its legacies, and white supremacy."

22. The Roberson Project concluded that in September 2020 that "The University was the only institution of higher education designed from the start to represent, protect, and promote the South's civilization of bondage; and launched expressly for the slaveholding society of the South" and that "For a significant portion of the 20th century, policies and practices on campus perpetuated Jim Crow, white supremacy, and mythologies about the honorable causes represented by the Confederacy."

23. Plaintiff was aware of much this history, and also of the university administration's expressed commitment to address past and present discrimination in accordance with its non-discrimination policies. Such awareness informed her decision to oppose race discrimination in the University's selection procedures by emailing the Dean.

24. Plaintiff's email to the Dean constituted protected opposition to race discrimination under Title VII and 42 USC §1981.

25. In emailing the Dean of Students directly, Ms. Van Cleave was complying with the university's policy regarding discrimination and harassment. Under "How to File a Report," the policy states that reports "can be brought to any of the following individuals" including "The Dean of Students in the College."

   C. **Within Two Months of Plaintiff's Email to the Dean, Her Supervisor Takes Materially Adverse Employment Actions Against Her.**

26. At the time of her email to the dean, Plaintiff was off for the summer. Plaintiff's position was a ten-month position, meaning that she was off during the months of June and July and returned to counseling students in August.

27. Plaintiff, other counselors, and the students were "remote" at this time due to the COVID-19 pandemic. This meant that during the 2020-2021 academic year Plaintiff and other counselors were working from home, and the students were also participating in educational and counseling activities remotely.

28. Within two months of emailing the Dean, Plaintiff's supervisor took materially adverse employment actions against Plaintiff by emailing HR about her and scheduling a meeting with Plaintiff in which she threatened the termination of Plaintiff's employment.

29. Specifically, on August 19, 2020, Ms. Liston-Avnaim sent an email to Mary Wilson in Human Resources falsely referring to Plaintiff as "an employee who is demonstrating a

pattern of consistent unprofessional behavior" and stating "I am not sure performance improvement is possible with this employee," even though Plaintiff was an excellent employee with a superb performance history and no documented performance issues. In the email, Liston-Avnaim claims "I have been vaguely documenting these encounters, but it is a more pervasive, ambiguous energy she injects into the work environment."

30. The alleged issues communicated in Liston-Avnaim's August 19, 2020 email were false and pretextual.

31. Thereafter, on August 26, 2020, Liston-Avnaim, along with Wellness Center Director Nicole Noffsinger-Frazier, met with Plaintiff.

32. This meeting was Ms. Liston-Avnaim's first opportunity to retaliate against Plaintiff, who had just returned to work following the summer break for her ten-month position, as stated above.

33. Revealing her true motivation for the meeting, Ms. Liston-Avnaim told Plaintiff that she should not again go to the Dean regarding any concerns, because that would violate the chain of command.

34. An email sent as a meeting recap confirms that Liston-Avnaim and Noffsinger-Frazier told Plaintiff that she needed to "respect the chain of command and utilize appropriate channels for discussing concerns," clearly referring to Plaintiff's email to the dean just two months earlier raising concerns about race discrimination in hiring.

35. During this meeting, Ms. Liston-Avnaim also raised pretextual concerns regarding a "reply-all" email Plaintiff had sent on August 17, 2020 expressing her concerns with increased workload expectations in the department. However, another similarly situated associate, Elise Anderson, also sent a "reply-all" email expressing identical concerns. In

6

regard to these emails, Ms. Liston-Avnaim treated Ms. Anderson, who had not engaged in protected activity, more favorably than she treated Plaintiff.

36. During the August 26, 2020 meeting, Ms. Liston-Avnaim threatened Plaintiff with termination. An emailed recap of the meeting states, in part, "Ashley informed Katie that if she does not meet these expectations or if Ashley or Katie discern in the next two weeks that the position is no longer a professional fit, CAPS and Katie will have to part ways."

> **D. After Plaintiff "Takes Ownership" of Claimed Concerns About Her Communication Style, Her Supervisor Escalates Retaliation by Requiring Live Supervision of her Therapy Sessions.**

37. Following this meeting, Plaintiff "took ownership" of her supervisors' claimed concerns about her communication style, even though those alleged "concerns" were pretextual and unfounded. Plaintiff wrote to her supervisor on August 27, 2020 that "After further reflection, I see how I could have handled it differently" and letting her supervisor know that "My intent was never to undermine your authority." Plaintiff wrote, "I am no stranger to heavy caseloads and hard work… I want to be clear that I am ready and willing to work to meet student need and fulfill your expectations."

38. Plaintiff's professional response to the August 26, 2020 meeting and her willingness to "take ownership", as stated above, left her supervisor deprived of a pretext to take further action based on the pretextual issues discussed in that meeting.

39. Next, following Plaintiff's willingness to "take ownership," Ms. Liston-Avnaim wrote in an August 28, 2020 email to Jessica Welch in HR that "there were a number of things not addressed" in the August 26, 2020 meeting including the "quality of her clinical practice."

7

40. In fact, there were no such issues regarding the quality of Plaintiff's clinical practice, which had always been excellent. Rather, Ms. Liston-Avnaim raised this new alleged issue as a pretext because Plaintiff's professional response committing to meeting workload expectations deprived Plaintiff's supervisors (who were "frustrated" and "upset" about her engagement with protected activity) of their initial pretext for pursuing adverse employment actions against her.

41. Plaintiff had a follow up meeting with Ms. Liston-Avnaim on September 1, 2020. During this meeting, Ms. Liston-Avnaim once again brought up Plaintiff's email to the dean.

42. Specifically, Ms. Liston-Avnaim admitted to Plaintiff during this meeting that she was "frustrated" when she learned that Plaintiff had contacted the dean of students regarding her concerns about race discrimiantion. Ms. Liston-Avnaim further told that Nicole Noffsinger-Frazier, the director of the University's Wellness Center who had also been in the August 26, 2020 meeting with Plaintiff, was "particularly upset" about Plaintiff sending that email.

43. Next, revealing her continued focus on Plaintiff's email to the dean, Liston-Avnaim on September 2, 2020 sent an email to Plaintiff asking her to be prepared to share her concerns regarding the hiring process in a second follow up meeting scheduled for September 9, 2020 – which also happened to be the end of the two week period when, according to her emailed recap of the August 26, 2020 meeting, the decision would be made whether "CAPS and Katie will have to part ways."

44. Making the connection explicit, Lison-Avnaim's September 2, 2020 email to Plaintiff states in pertinent part as follows: "Hi Katie […] Do you have 20-30 minutes that afternoon to discuss your hiring concerns and any other barriers to utilizing me for

8

support? Our meeting next Wednesday with Nicole will include more structure and focus on the two week discernment period and next steps…"

45. On September 8, 2020, Defendant's Board of Regents issued the statement referenced above.

46. On September 9, 2020, instead of discussing Plaintiff's concerns with race discrimination in the hiring process, Ms. Liston-Avnaim took an additional materially adverse employment action against Plaintiff by informing her that since Plaintiff had made comments about her ability to carry a large caseload, she wanted to engage in live supervision of Plaintiff's therapy sessions.

47. The articulated reason for this additional materially adverse employment action is false. But for Plaintiff's engagement in protected activity, Ms. Liston-Avnaim would not have required her to undergo live supervision. Ms. Liston-Avnaim likely expected Plaintiff to refuse live supervision, thereby giving her a pretext for terminating Plaintiff's employment in retaliation for Plaintiff's engagement in protected activity.

48. This new plan was threatening, humiliating, and compromising of Plaintiff's professional obligations to her patients. Such supervision typically would only occur with unlicensed therapists or graduate students, not with an experienced professional such as Plaintiff. As such, it constitutes an additional materially adverse employment action. Nevertheless, Plaintiff made clear that she was "willing to participate in live supervision."

49. Plaintiff's willingness to comply with her supervisor's demands and her consistently professional tone in her interactions with her supervisors and with her coworkers meant that Liston-Avnaim at this time was unable to carry out her intention of terminating Plaintiff's employment in retaliation for her engagement in protected activity.

### E. **Plaintiff Again Engages in Protected Activity in January 2021, and Her Supervisor Retaliates by Requiring Her to Record Sessions and Causing Her Termination.**

50. Between September 2020 and February 2021 Plaintiff's work performance and conduct remained excellent, and no issues were raised with her or by her supervisors.

51. However, everything changed again on January 20, 2021, when Plaintiff again engaged in protected activity.

52. On that date, Plaintiff participated in "unconscious bias" training for student life staff.

53. During a small group discussion that was part of the training, Plaintiff, responding to the discussion prompt, identified a bias similar to what Ms. Liston-Avnaim had expressed in her email (the perception that people of color would not want to come to rural Tennessee) as a bias she had noticed on campus. Her small group selected this bias to be shared with the larger group which included Ms. Liston-Avniam, who of course was perfectly aware that she had shared just such a bias during the hiring process that had been the subject of Plaintiff's June 15, 2020 email to the dean. Noffsinger-Frazier was also present.

54. Plaintiff's sharing of this bias was protected activity because it constituted continued opposition to race discrimination on campus, informing Ms. Liston-Avniam that Plaintiff continued to believe that Ms. Liston-Avniam injected or might in the future inject racial bias into the hiring process through the belief she expressed to Plaintiff about people of color not wanting to come to rural Tennessee.

55. Just two weeks later, on February 4, 2021, Ms. Liston-Avnaim resumed her retaliatory attack on Plaintiff.

56. Plaintiff had a meeting with Ms. Liston-Avniam on February 4, 2021 for the purpose of discussing a client of Ms. Liston-Avnaim's that Plaintiff had seen, as well as sharing

general thoughts regarding student programming on campus. However, the meeting soon segued into retaliation, with Ms. Liston-Avnaim informing Plaintiff that she wanted to discuss alleged concerns regarding two colleagues who, according to Ms. Liston-Avnaim, had allegedly stated that Plaintiff's demeanor in team meetings was negatively impacting the team.

57. These alleged concern about Plaintiff's "demeanor" were pretextual, as Plaintiff had not behaved unprofessionally or exhibited poor demeanor on any occasion. Moreover, any team meetings that occurred during the 2020-2021 school year had necessarily taken place over Zoom, meaning that Plaintiff and her co-workers had not even been in each other's physical presence during this time. Ms. Liston-Avnaim provided Plaintiff with no specifics about what aspects of her "demeanor" during Zoom meetings was inappropriate or unacceptable.

58. Defendant's staff handbook states that "progressive disciplinary action will normally precede separation for staff members who have finished the introductory period and have regular appointments."

59. At this point, Plaintiff had received no formal disciplinary action at any point during her employment with Defendant. Plaintiff received no written discipline prior to her termination.

60. Ms. Liston-Avniam followed up this meeting by resuming her behind-the-scenes attack on Plaintiff's work performance, writing in a February 9, 2021 email to Jessica Welch in HR in pertinent part as follows:

> I am going to implement a new performance improvement plan
> requiring Katie to record up to 50% of her sessions, observing 1-2
> per week and will document my feedback and any concerns
> regarding performance. I am going to implement the plan for the

11

> duration of this semester unless a significant liability concern
> emerges. There will be a lot of transitions happening in CAPS
> come May, so this feels like a natural time to conclude the plan and
> part ways if necessary and with meaningful documentation…

61. The email further states, "I will send you the updated, more detailed documentation you requested for HR records," confirming that no performance documentation existed at the time she wrote this email.

62. The new plan to record "up to 50%" of Plaintiff's sessions constitutes an additional materially adverse employment action. But for Plaintiff's engagement in protected activity during the January 20, 2021 unconscious bias training and/or but for Plaintiff's engagement in protected activity in sending her email to the dean in June 2020, Ms. Liston-Avniam would not have instituted this plan.

63. Ms. Liston-Avniam's reasons for requiring Plaintiff to record up to 50% of her sessions were false and pretextual, as there were no documented concerns with Plaintiff's work performance—other than Ms. Liston-Avniam's pretextual emails to HR and the emailed meeting recap containing pretextual issues as referenced above.

64. Recording sessions typically would only occur with unlicensed therapists or graduate students, not with an experienced professional such as Plaintiff.

65. Once again, Plaintiff did not react as Ms. Liston-Avnaim clearly hoped she would; instead, she accepted the new requirement with professionalism and courtesy in an email to her supervisor on February 17, 2021. Liston-Avnaim even admitted in an email that "I got a very agreeable response from her…"

66. Plaintiff did communicate concerns she had about recording patient interactions; however, her email concluded, "Nevertheless, if video recordings are a requirement for

my position, I will certainly comply as long as we establish HIPAA compliant procedures."

67. After Plaintiff expressed her willingness to comply, Ms. Liston-Avnaim again switched tacks, sending the following email to Jessica Welch in HR on February 19, 2021:

> Hi Jessica,
>
> I left a message for you before lunch, but I will send an update email to prep you for our conversation.
>
> After meeting with Nicole today and reviewing the first improvement plan for Katie Van Cleave from September, there is one glaring violation that falls under a primary responsibility in her job description. If you could send me her official job description, that would be most useful. This violation is her consistent passing off of student-clients on her caseload to other members of the team. Ludine reported to me on 2/17 that she has received three such cases-- one of which was discussed with the entire treatment team, two of which I had no knowledge and Katie scheduled separate meetings with Ludine to convince her it was wise to take on these cases. Ludine is a new employee and thought that she was bound to do as Katie suggested, which is a misuse of power on the part of Katie as a senior member of CAPS. There is a clear pattern of the types of cases she hands off to others. I will spare you the details, but those details are included in the improvement plan documentation should you need them. Conducting individual therapy with students is a core and essential part of her job description. I can think of upwards of 10 students who have either refused to see her or have transitioned to other therapists at the behest of Katie.
>
> With Nicole's leadership and guidance, she was able to talk through the cost/benefit analysis with me in terms of the burden on the team regarding asking Katie to exit now versus continuing on this path in which I am spending hours each week doing damage control with the rest of the team and offering pre-master's level training to a licensed professional. I would like to move forward with termination with the offer of 3 months severance on the basis of the violation to the original improvement plan.
>
> Let's talk more by phone about next steps.
>
> Thank you,

Ashley

68. This email was filled with false and pretextual allegations. For instance, Plaintiff did not engage in inappropriate "passing off" of student clients. Nor was her supervisor legitimately "spending hours each week doing damage control with the rest of the team and offering pre-master's level training to a licensed professional." These allegations are false and a pretext for seeking Plaintiff's termination.

69. Based on the sequence of events outlined above, it is clear that but for Plaintiff's engagement in protected activity during the January 20, 2021 unconscious bias training and/or but for Plaintiff's engagement in protected activity in sending her email to the Dean in June 2020, Ms. Liston-Avniam would not have sought her termination in February 2021.

### F. **Defendant Terminates Plaintiff's Employment Based on False Information Provided by her Supervisor, Including Plaintiff's Alleged Violation of a Secret "Performance Improvement Plan" that Was Never Shared With Her.**

70. Based on the false information provided by Plaintiff's supervisor, Defendant terminated her employment on February 25, 2021, with the separation notice stating as follows:

> This letter is to inform you that we are terminating your employment effective March 1, 2021 for failure to comply with your Performance Improvement Plan issued September 2, 2020.
>
> Your failure to comply includes the following:
>
> 1. Seeking to pass-off cases to other clinicians and demonstrated resistance to cases representing at least 25% of diagnoses rendered in CAPS
>
> 2. Sustained, demonstrated resistance to monitoring of clinical work, specifically recording individual therapy sessions

14

> 3. Demonstrating consistent indirect, passive communication with Director and coworkers which degrades professionalism and morale in the work place.

71. These reasons are false and a pretext for retaliation, as Plaintiff did not seek to "pass-off" cases, did not "demonstrate resistance to cases representing at least 25% of diagnoses rendered in CAPS," and did not show "Sustained, demonstrated resistance to monitoring of clinical work, specifically recording individual therapy sessions," and did not demonstrate "consistent indirect, passive communication with Director and coworkers."

72. Moreover, no "Performance Improvement Plan issued September 2, 2020" was ever shared with Plaintiff during her employment.

73. Plaintiff received a copy of the purported "Performance Improvement Plan" for the first time only after her termination.

74. The "Performance Improvement Plan" that was provided to Plaintiff after her termination includes many issues that were never raised with her in September 2020 or at any other time.

75. The document includes a section addressing Plaintiff's June 16, 2020 email to the dean, stating in pertinent part as follows:

> On June 16, 2020, employee had an issue with Staff Clinician hiring process, but never set a meeting for resolution with Director of CAPS or her supervisor, Associate Dean of Health and Wellness. Employee instead went directly to the Dean of Students to levy this grievance without informing Director or Dean of Health and Wellness that this was occurring. Employee does not respect the chain of command and is unprofessional in attempts to resolve conflict. This also illustrates a pattern of deceptive and secretive behavior in workplace, gossip about other employees within and without the UWC.

76. Accordingly, it is clear that but for Plaintiff's engagement in protected activity in sending her email to the dean in June 2020, Defendant would not have terminated Plaintiff's

15

employment. Alternately or in addition, but for Plaintiff's engagement in protected activity during the January 20, 2021 unconscious bias training, Defendant would not have terminated her employment.

## V. Cause of Action – Retaliation – Title VII and 42 USC §1981

77. As stated above, Plaintiff engaged in protected activity on at least two occasions, including her June 2020 email to the Dean and her January 20, 2021 statements during the unconscious bias training.

78. Plaintiff's supervisor, Director of Counseling and Psychological Services at the University Wellness Center Liston-Avnaim and Wellness Center Director Nicole Noffsinger-Frazier, were both aware that Plaintiff had sent the email to the dean.

79. Plaintiff's supervisor, Ashely Liston-Avnaim, was present during the implicit bias training on January 20, 2021.

80. Wellness Center Director Nicole Noffsinger-Frazier also was present for this training.

81. Plaintiff had a reasonable, good faith belief that her supervisor, Ashley Liston-Avnaim, was injecting racial bias into selection processes and/or that she might do so in the future.

82. In response to Plaintiff's engagement in protected activity, Defendant took numerous materially adverse employment actions against her that would discourage a reasonable employee from making or supporting a Charge of Discrimination. But for Plaintiff's engagement in protected activity, Defendant would not have taken such actions.

83. The materially adverse employment actions taken after Plaintiff sent her email to the dean include: 1) threatening the termination of Plaintiff's employment; 2) instituting a requirement of engaging in live supervision of therapy sessions; and 3) placing Plaintiff on a secret "performance improvement plan" that was ultimately cited as one of the bases

for her termination. But for Plaintiff engaging in protected activity by sending her email to the dean, Defendant would not have taken such actions.

84. The materially adverse employment actions taken after Plaintiff sent her email to the dean and also after she made her January 20, 2021 statements during the unconscious bias training session include the following: 4) instituting a requirement to record "up to 50%" of Plaintiff's counseling sessions; and 5) terminating Plaintiff's employment. But for Plaintiff engaging in protected activity by sending her email to the dean, and/or but for Plaintiff engaging in protected activity by making her comments in the training session, Defendant would not have taken such actions.

85. Even if Defendant had legitimate or non-retaliatory reasons for taking any of the above materially adverse employment actions, which it did not, retaliation remains a "but for" cause of each of the materially adverse actions Defendant took against Plaintiff.

86. Defendant's retaliation against Plaintiff was done maliciously, willfully, and with reckless disregard for the rights of Plaintiff.

87. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged herein and this suit for backpay, declaratory judgment, injunctive relief, compensatory, and punitive damages is her only means of securing adequate relief.

88. Plaintiff is now suffering, and will continue to suffer, irreparable injury from Defendant's unlawful conduct as set forth herein unless enjoined by this Court.

## VI.    Damages and Prayer for Relief

Plaintiff respectfully prays that the Court grant her the following relief:

1.      Issue a declaratory judgment that the employment policies, practices, procedures, conditions and customs of Defendant violate the rights of Plaintiff secured by Title VII of the

Act of Congress known as the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et seq., 42 U.S.C. Section 1981(a), and 42 U.S.C. Section 1981.

2. Grant Plaintiff reinstatement into the position she would have had at the appropriate pay (with interim adjustments) absent the above retaliation, a permanent injunction enjoining the defendant, its agents, successors, employees, attorneys and those acting in concert with the defendant, and at the defendant's request, from continuing to violate Plaintiff's rights as well as those who are similarly situated pursuant to any of the above-named statutes.

3. Pursuant to Title VII of the Act of Congress known as the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 1981a and 42 U.S.C. Section 1981, enter an Order requiring Defendant to make Plaintiff whole by reinstating her into the position she would have occupied in the absence of retaliation or awarding her front pay, awarding her back-pay (plus interest), nominal damages, compensatory damages, punitive damages and post judgment interest. Plaintiff also seeks an award of special and consequential damages including the balance of her student loans, as Plaintiff was eligible for federal loan forgiveness pursuant to her position with Sewanee and lost her eligibility as a result of her termination, leasehold benefits of approximately $800 per year, paid vacation and sick leave time that she lost as a result of her termination, and 401k contributions of 10% of her salary per year, and the value of health insurance benefits.

4. Plaintiff further prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees, and expenses.

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY.**

Respectfully submitted,

/s/ Daniel Arciniegas

Arciniegas Law
1242 Old Hillsboro Rd.
The Atrium Building
Franklin, TN 37069
(629) 777-5339

Jon C. Goldfarb (pro hac vice admission pending)
L. William Smith (pro hac vice admission pending)
Counsel for Plaintiff
OF COUNSEL:
WIGGINS, CHILDS, PANTAZIS, FISHER,
& GOLDFARB LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500